We'll hear argument first this morning in Case 09-1298, General Dynamics v. United States, and the consolidated case, 09-1302, Boeing Company v. United States. Mr. Phillips. Thank you, Mr. Chief Justice, and may it please the Court. The proposition that Petitioners are here challenging is the one adopted or embraced by the Federal Circuit that says that the United States Government can declare that certain of its government contracting partners have operated in default and under those circumstances can reach into the government contractor's pocket, withdraw at the time $1.35 billion of monies that were spent by the United States but for services that were rendered without question pursuant to the contract, pursuant to the instructions of the United States Government, and that when the government does so, that it has engaged in some kind of default conduct, that the government can assert the state secret's privilege, and in so doing deprive the contractor of the ability effectively to respond to the government's conclusion. Under those circumstances, it seems to me that the statement in this Court's decision in United States v. Reynolds, which is that the government is certainly free to assert the state secret's privilege, but when it does so, it has to assume certain responsibilities that come from it, at least in the circumstances where the United States is the moving party. Ginsburg. Mr. Phillips, when the contractors, when they failed to deliver the first aircraft at the time specified by the contract, their reason was that its cost would far outrun the contract price, and so it sought to reformulate the contract. At that time, correct me if I'm wrong, but I think at that time the contractors said nothing at all about the superior knowledge and the government's obligation to share information that it hadn't shared. There was nothing specific with respect to that, Justice Ginsburg. The first time the contractors identified the superior knowledge problem arose, obviously, when the government took the extraordinary step of issuing a cure notice, because up until that point, obviously, the parties are attempting to negotiate and work to a final resolution of this project, as you would hope any contracting entities would, to bring the contract to a happy resolution. So you would expect them to say, if they, if that was the impediment to going forward on this contract, to at least mention it. Well, I think you have to put it in context, Justice Ginsburg, because during this period of time, obviously, there were consistent efforts and requests being made to get access to both the B-2 and the A-117 stealth technologies, and there were discussions that went back and forth, and the district court and the court of Federal claims specifically held. Eventually, the information was forthcoming, but it was, candidly, too little and too late in order to effectively allow the contract to proceed as planned. So I think you, I mean, I agree, you know, in a perfect world, maybe you would have identified this. But in this situation, the parties are simply trying to come to some kind of a resolution that allows both sides to be satisfied by the final disposition. Sotomayor, why wasn't the need to share that technology a part of this contract or a condition to the contract? I've gone through the contract that or not all of it, enough of it. I haven't found anywhere in the contract that it requires the U.S. to share information with you. Does that have anything to do with what due process would require? No, I think, I think Justice Sotomayor. I'm going to pose a hypothetical. Let's assume the contract required the sharing of State secrets. And the government then invokes its privilege. Is that a different case than this one in terms of due process? Wouldn't the former situation where it's made, it made a condition of the contract require a different treatment than this situation where the government's just saying if you want to raise a defense that's not part of the contract, then you do whatever the other litigant with the privilege does, whose privilege has been invoked against, you proceed with whatever evidence you have? That's usually what happens with other privileges. Right. And we would have been perfectly content to proceed with the evidence that we had, but the ultimate decision by the court of Federal claims was that it was impossible to ultimately be in a position to resolve it. But I want to answer your more fundamental question, Your Honor, as to the, you know, the basic point is, is that the background principle of law, the superior knowledge defense, is the understanding of the parties when they enter into an agreement. I mean, that would have been true just as much in the Helene Curtis case and the other cases where the Federal Circuit has acknowledged the superior knowledge defense. That's been around for a long time. It's an understood basis on which the parties enter into an agreement. That's the first answer. The second answer is that you're asking us to put into a contract something about information that we don't know anything about. I mean, we have some sense about the B-2 and the A-117, but we don't know anything about the other programs that are identified here. Sotomayor, where's the obligation of the government to tell you, build it this way using the technology we already have? I thought your claim was that you were promised this information and you structured the contract based on that promise. Well, our claim, we have separate, we have a series of distinct claims. Our first claim is that we never would have entered into the contract in the first place if the government had provided us with information based on its superior knowledge that the, for instance, the weight specifics that we were being asked to provide or to supply were literally impossible to comply with based on what the government already knew. If we had been just told that much, just given a warning, we wouldn't be in the situation where we are here. Sotomayor, there's a factual dispute about that. I think somewhere I read that there is a claim that they told you your weight estimates weren't right. Well, I mean, there may be a factual dispute, but I'd be happy to litigate that issue if we can get to that point where we are in fact allowed to litigate any aspects of our particular defense. But the bottom line here is, and again, to state the proposition as starkly as it is, because this is the way it comes to the Court from the Federal Circuit, they're going to put a claim for $1.35 billion against us and tell us that we cannot defend against that claim, even though the reason why we were unable to comply with the contract is because of the fact that the government didn't provide us information either at the outset or as we were picturing. Breyer. Two questions I'd have is, first of all, Justice Sotomayor, sorry, I didn't, I didn't hear you say. I did have her question, because what that suggests is in this case, it's not unfair to hold your client in this case and just read the two circuit court opinions here and you think this is a defense coming out of long in the past that doesn't have much substance to it. That was her question, I think, as I understood it. In other words, it's not unfair. But let me give you the other question, because sometime in your argument I'd like you to get to that. And that is, if we accept as a principle of law what was said in Reynolds, a criminal case or whatever, and apply it to government contracting, where sophisticated contractors are perfectly capable of negotiating their own contract, we are not just throwing a monkey wrench into the gears of government contracting. We're throwing the whole monkey. That's my second question. One, that this isn't a case that calls for it. And two, the threat to government contracting by changing from Reynolds to here is overwhelming. Now, I'd like your views on both of those. Right. Well, it seems to me clearly that this is the precise situation where Reynolds is saying if you cannot bring forward a legitimate defense. I mean, part of the problem is we don't know precisely what information we didn't have and we're never entitled to do that. So it's very difficult to say how strong is our defense under these circumstances. What we do know is that the court of Federal Claims judge looked very carefully at this and said that we had made an impressive showing without regard to any of the confidential or privileged information of a prima facie defense in these circumstances. So our position is we had a very valid defense. This is not pretextual. We're not throwing this in simply as a mechanism to force the government to assert its State secrets. It's a fairly contrived approach to litigation and, frankly, not something that I could imagine any circumstance in which we would do that. Two, I don't see how this throws a monkey wrench into this process whatsoever, much less throws out the monkey, because the basic understanding here is that the government is not entitled to force its contractor down a ruinous course. If the government has information available to it, then it has to make that information as to be forthcoming with the information with the contractor, either at the outset, which would have been the best of all circumstances here, or as matters go along. Alito, the Petitioners as a formal matter were the moving party, isn't that right? Well, not a – I mean, moving party I think is the – is not a self-defined concept, Justice Alito. The Petitioners are the plaintiffs. They were the plaintiffs. And the review scheme that you outlined was known to them beforehand. So why do we need to look beyond that? Well, because the review scheme also says that the very – that 1986 in the Assurance case, the Federal Circuit said, which was before this contract was entered into, the Federal Circuit said the filing, the mere filing of a complaint immediately vacates the contracting officer's rule. So our understanding at the time we entered into this agreement is that if there were a problem with the way the contracting officer operated, we would be allowed to file a claim and immediately take the contracting officer's rule off the table. Under those circumstances, it seems to me all we are asking for is to go back to the status quo ante under the – in that situation, which means there is no contracting officer decision, there is no basis on which the government can make a claim for $1.35 billion, now $3 billion. Ginsburg. Can you explain that? You referred to it several times now. I thought that that was not a progress payment based on completed work. The government says that that money was advanced. You had not complied with what was necessary to comply with to get that $1.35 million. They distinguished the $1.35 million that you legitimately received as a progress payment, but this next, they said, you had not fulfilled what you needed to do to get that. Well, what had not happened is that the final – there had not been a final sign-off by the contracting officer approving it and thereby reducing it to a liquidated claim. But that's a vastly different statement than to say – and indeed, we have an argument that at least with respect to half of that, that it had already effectively been approved through a mechanism independent of the contracting officer. But the bottom line here is these were services rendered, actually rendered. This was not some kind of a prepayment for services to be rendered in the future. That's not the nature of this contract. These were – this was for work we had done for which we had submitted specific claims and for which the contracting officer had pending before him at the time. And so, you know, what the government says is that it's – is that it was a payment and they didn't ultimately get the airplanes that were the ultimate desire of the contract under these circumstances. And that's obviously true because they terminated the contract a year before the contract was provided to them. But you are here seeking to emerge as the total winner, that is, to get from this contract what you would have gotten if it had been successfully completed, including any profit. No, no, Justice Ginsburg, that's not true. All we are asking for is the – are the remedies that are fully available if you were to convert this from a termination for default into a termination for convenience. And under those circumstances, what – you know, that – the government has a wonderful mechanism there. It protects it against the kinds of lost profits, damages that might otherwise be available in a situation where you have a more traditional breach of contract. So all we are – all we are asking for is the actual amount of money that we expended, that the – frankly, the court of Federal claims explicitly found, and at this stage it's unchallenged, although it presumably might be litigable at some point, but that these were all reasonable, allowable, and fairly allocable costs to these – to this particular contract. Alito, why shouldn't we view this as if it were a dispute between two private contracting parties? And if we did that, perhaps one party would be the moving party with respect to some of the claims and the other party would be the moving party with respect to the remaining claims. Justice Alito, I think that is precisely how you ought to look at it. And we would be very comfortable with that, because it's quite clear to me that except in the hyper-technical way that you articulate because of the way the Contracts Disputes Act plays out, that the government is unquestionably the moving party, the party seeking affirmative relief to be able to take $1.35 billion. I think it's questionable, Mr. Phillips, for this reason. You say that it's an implied term of this contract that the government has a duty to share certain information, and you are seeking to enforce that implied term of the contract. So it seems to me, as to that alleged duty, you are the moving party. You are saying, court, please enforce this implied term of the contract. Phillips, Well, not – I mean, you can – that's one way to articulate it. I think the other way to articulate it, which is much more consistent with the reality of what's going on here, is that the government is making a claim for $1.35 billion for which, on the basis that we did not act in a timely fashion. And that's the only basis that exists in this litigation anymore, is just the time of the actions that we took. And our answer to that claim is to say, no, we are not at fault for the delays, because you did not provide us the information or you did not spare us the burden of having to go down this path in the first instance. Scalia, But then you go on to say, moreover, give us the payment for the additional money beyond the $1.35 that you've already given us. It's this additional money that we've expended. Phillips, Right. But that just goes to Justice Alito's question about is there some way to evaluate those claims separately. And the answer is yes, they should be evaluated separately. Scalia, Well, why shouldn't we? I mean, it seems to me, if indeed you say the government has come up with a defense that makes it impossible to decide who's in the right here, why don't we just, you know, I think the usual course taken by courts would be to leave the parties where they are. The matter can't be litigated. That would mean you would keep your $1.35 billion, but you wouldn't be entitled to sue for the additional amount. If you were that worried, you should have had more frequent progress payments or something. But why don't we just leave you where you are, both you and the government, assuming we agree with you on all the rest? Phillips, Well, I mean, to be sure, we would be much more comfortable in the world you just articulated, Justice Scalia, that we are in the Federal Circuit. Scalia, $1.35 billion. Phillips, With interest. Scalia, With interest. I forgot that you had. Phillips, It's starting to add up, Your Honor. But, and certainly we think that's, that is the minimum that we should be entitled to, and maybe to some extent you could say we're sort of being a little greedy. But the reality is that the standard rule is that if you take a contract and you say you cannot make a determination that the contractor has been guilty of default, then that contract should be in the basic contract law, and it's also in this agreement, that you convert it to a termination for convenience. And then the question simply is what rights flow from having declared this to be a termination for convenience. Ginsburg, You mentioned the 1.3, that you get to keep the 1.3 and 5 million. But there was also another figure, 1.2 million that you would get on top of that. Phillips, Right. And that, and that's Ginsburg, So that certainly wouldn't be leaving you where you were. Phillips, Well, no, I mean, actually, what the $1.2 billion was, was the additional amounts of money that were actually expended by the contractors that were reasonable, allocable, and allowable by, according to the Court of Federal Claims, on this agreement. So the, and it would be the standard operating procedure. If you have a termination for convenience where the government says, look, we've decided we just don't want to have this, these, we don't want these airplanes anymore, so let's just call it off, which the government has the right to do. And then the question is what are the reasonable costs that are, you know, sort of reallocated as a consequence of that. And the Court of Federal Claims, Scalia, But the government didn't do that. I mean, you're making it up. The government didn't terminate for convenience. The government claims you're in default. Why would, why should we force that down the government's throat when we can no more say that the government's wrong than we can say that you're wrong? Phillips, Well, it seems to me that, yes, I mean, the question is what's the default rule in that case? Scalia, Call the game off. Phillips, Well, and the question is, if you call the game off, what flows from that? And it seems to me that you can say, well, let the government call it a default, I suppose, or you could just as easily say, and obviously the position we would take is you say the government cannot call it a default, because in order to get some kind of a determination along those lines, somebody's going to have to make a judgment. It's not an honest assessment of the facts of this case. And so if you say it's not a default termination, then there's just a certain amount of, certain consequences that flow from converting it, and it automatically converts at that point to a termination for convenience. And in a termination for convenience situation, then you reallocate the costs in precisely the way that the court of Federal claims has done this at this point. Scalia, The policy is we're not saying, assuming we agree with you on the rest, we're not saying that it's not a default termination. We're saying we don't know. Phillips, Right. And the question is? Scalia, We don't know. We don't know what the State Secrets thing is. The government is entitled to make that determination. So we don't know who's in the right here. Phillips, Well, I the problem is. Scalia, So why force the government to go to termination for convenience? Phillips, Right. Well, I would think that the more appropriate way to proceed under those circumstances, given that a default termination carries with it a lot of collateral consequences, it exposes you to subsequent problems in the contracting context, it creates the possibility of debarment in future proceedings, that rather than allow a finding that no one has can comfortably conclude is the right finding to stay in place and have those collateral consequences flow from it, the more appropriate way to proceed would be to say, look, I can't make a determination in this case that there should be a termination for default. And under those and so therefore, under the contract, under government contracting principles generally, it automatically converts over to a termination for convenience, and once that happens, then you go down the road of evaluating those costs. And again, the government's got arguments about those costs, I'm sure, and we can debate those out, although, you know, I would commend the Court to the. Sotomayor Mr. Phillips, give us a way, a reasoned way, to reach the result Justice Scalia is suggesting. Because you are being greedy. You admitted it. The termination for convenience carries its own automatic consequences that appear unfair in light of the fact that the litigation of the default termination has been invoked because there is a risk to the United States. So is there a reasoned way to do it? Phillips Are you? Sotomayor To not impose that unfairness on the government. And if there is not, then explain to me why it's unfair, given that you are two sophisticated contracting parties, to say you entered a contract knowing the government could invoke State secrets, it has, and so you bear the risk of that. I mean, you always knew the government could do this.  But, well, I don't know whether you want me to answer the second part first or go back to the original question. Sotomayor You could have contracted around it. Phillips Sure, and so could the government. I mean, the reality is that the background principle here is United States v. Reynolds. And United States v. Reynolds says that if somebody is the moving party, that is, the party seeking affirmative relief, that's the party who is going to bear the burden of the contract. Kagan Could I ask you whether that principle makes any sense in this contracting situation, because both parties have argued it as though the question of who is the moving party is determinative in this case. But in a contract situation, the question of who is the moving party is very often arbitrary or fortuitous. If you think about it in a private setting, you have one contract, one contractor who fails to perform or provides some deficient product, another who decides it's not going to pay, and the question of who the plaintiff is, is often just a matter of fortuity, who gets to the courthouse first, what the payment schedule has been like, so whether somebody is demanding their money back or simply refusing to pay it at all. So why in this contract situation is the question of who is the plaintiff or who is the moving party, why does that make such a difference? Phillips Well, I think that actually the Court in Reynolds, to the extent it would have envisioned any of these circumstances decades ago, used the language moving party rather than plaintiff or defendant precisely for that reason, because I think what the Court had in mind is the party who is seeking affirmative relief. Ginsburg I think you should be thinking of a tort. I wasn't thinking Reynolds is a tort action. Phillips Oh, no. To be sure, that's the specific context, although the Court's language is broader than that. It just didn't talk about itself as a defendant in a tort action. Kagan But it can't possibly be the case that the question of what the payment schedule is. If I've paid you already and then I find your product deficient, then I'm going to go to court and demand my money back. If I find your product deficient before I pay you, then you're going to go to court and say, you have to pay me. So why should that difference make a difference with respect to the constitutional question before us? Phillips Well, because in the one situation, I have $1.35 billion in my pocket for services that were unquestionably rendered and which, in our judgment, you know, satisfied our portion of the obligation under this contract. Kagan Both parties have a claim here. One says you provided deficient performance. The other says you were obligated to pay me. The question of who has the claim and who has the affirmative defense, it can be structured in either way. Phillips I don't disagree with that, Justice Kagan. I think the bottom line, though, is, you know, what are fundamental – what do principles of fundamental fairness tell you to do in this context? Breyer That's exactly my problem, because when I looked at Reynolds, Reynolds doesn't hold anything in your favor. It holds the opposite way. It says to you, in a criminal case, we said it was unconscionable for the government both to prosecute and not to – not to tell them the secret, okay? And it says such a rationale has no application in a civil forum where the government is not the moving party. It doesn't say anything about where the government is the moving party. And Exhibit A, that it is not unconscionable here, consists of the two opinions of the Federal Circuit. I mean, now, what do you want me to read to get over that impression? Phillips Well, I mean, the very fact that the Court says and limits its ruling to where the government is not the moving party, I mean, if the government really – if the Court didn't limit it, it said the rationale is unconscionable. Now, I don't even have to go that far. I can go to fundamentally unfair. All I want to know is what should I read to get over my unfortunate impression, which I got out of the two opinions that I did read, that there was nothing unfair. Okay? What do you want me to read to get over that impression, which I think you do want me to read something? Phillips Right. Well, no, you should clearly read the court of Federal claims opinion that gave rise to this in the first place, where the judge says, we have made an impressive prima facie showing of a defense. And the Federal Circuit's view is, we don't care. We're not going to let you go down that path, period. And all we're saying is, in that situation where we've made that kind of showing, the default rule should be the government cannot reach into the market and pay. Sotomayor Just before I get there, that showing was based on the court's in-camera review of quite a bit of already confidential information, correct?  And the nonprivileged information that we have available to us. And the nonprivileged information, so it made this judgment on the basis of a great deal of information, and yet it couldn't conclude that you were right as a matter of law, correct? Phillips Well, it recognized that it terminated the discovery early. Actually, it did – it terminated the discovery very early, and there are whole programs that we know nothing about. We know about the B-2 and the A-15. What we don't know are the other programs. And there's nothing in this record on any of that, Your Honor. Roberts Thank you, Mr. Phillips. General. Katyal Thank you, Mr. Chief Justice, and may it please the Court. Two basic things decide this case. First, the government is not affirmatively invoking the power of the Federal Court, only the plaintiffs are. It was Mr. Phillips' clients who 20 years ago walked into the Federal Court and asked that court to set aside the decision of the contracting officer and to award them over a billion dollars in damages. The government, by contrast, simply asked the court to dismiss the Federal lawsuit. And second, Reynolds makes clear that the state secret's privilege will be used to bar a claim at most only when the party that is relying on secret information is trying to use the Federal court to alter the legal status quo. And that's why I'm saying that the government is not affirmatively invoking the power of the Federal court. They say you're at fault. Under the state secret's doctrine, we can't resolve that question. Why don't we call the whole thing off, nobody's at fault? That means it's terminated, not for fault, but for convenience, and that's it. Katyal Well, for several reasons. One is, that is the affirmative use of the Federal courts to alter the legal status quo. I think the principle of Reynolds is that Roberts Well, only because you altered the legal status quo. The legal status quo is they're going along with their contract, and you altered it by holding them in default. Katyal I disagree, Mr. Chief Justice. I think that the contract itself specifies that the contracting officer will decide whether or not there's a default termination, and once there is that, they owe the one thing the contracting officer so decides, then they owe the unliquidated payments that have not been paid. Roberts Isn't that the affirmative step, with the contracting officer saying there's a default? Katyal Well, it's certainly an affirmative step under the terms of the contract, but it is not an affirmative step of the Federal court. Our central proposition Roberts What's an affirmative step of the Federal government? He works for you, and he's the one changing the status quo. Katyal Undoubtedly the case, and those are the terms under the contract to which they agreed. Our central proposition is that in a world in which the Federal court doesn't know, as Justice Scalia said, who is right and who is wrong on a particular claim, it should stay its hand entirely and get out of the business altogether. It should follow the Hippocratic principle of doing no harm. Alito Am I correct to interpret what you've just said to mean that you think this case should be decided under the basic principle of Reynolds, that the party that seeks the affirmative relief, seeks affirmative relief from the court is the party that bears the burden involving the invocation of the state secrets privilege? You're not asking us to adopt a new test applicable in the contract situation? Katyal Absolutely. I don't think we need to go there. I do think that there are special arguments available in this case because it is a contract, as Justice Breyer said, of sophisticated parties who ex ante will decide who bears the burden of coming into court and so on. But here I think this is a simple principle that in a world in which the court doesn't know who is right and wrong on the superior knowledge defense, and that's the answer to the question that Justice Sotomayor asked to Mr. Phillips a moment ago about what did the court of Federal claims ultimately decide. They didn't decide there was a prima facie case. They said at page 245A, this is the 2001 opinion, we can't know one way or the other. And so Sotomayor Could I go? I'm interrupting Justice Alito because you answered his question very quickly. It's your position that if we determine you're the moving party, you lose? Katyal Oh, no, I think Sotomayor Is that your answer to him, which is that he asked you whether we apply Reynolds. You didn't say which part of Reynolds. Are you conceding that if we apply Reynolds and we find you're the moving party, you lose? Katyal Oh, absolutely not, Justice Sotomayor. I don't think Reynolds says that if the government is the moving party, it's an automatic  I think that's a backup argument that we have advanced in our brief that I think there is no reason whatsoever for the court to consider that. Scalia Let's talk about moving party. I don't know that moving party means who comes into court first. I would, in the context of a contract dispute, I would say the moving party is the party who is trying to use principles of law to change the contract.  The government is blowing the whistle. It is the government which is saying you are in default and under the law, since you're in default, we can walk away and indeed we can claim the money we've already paid you. That seems to me the moving party in the context of a contract. Katyal Justice Scalia, I think it's important to add to your definition using legal principles in a Federal court, because that's, I think, what Reynolds is talking about. There's not some abstract Scalia Reynolds was talking about that because that was the fact situation in Reynolds. But I'm saying that the logic of the matter, the logic of the matter when applied to a contract situation such as this ought to be the party who is blowing the whistle, who is trying to use the law, the one who is asserting that the law requires this result. And then we say, well, we can't tell whether the law requires this result or not. That, it seems to me, ought to be the moving party. Katyal I don't think, Justice, that's what either Reynolds is getting at or what this Court's subsequent decisions about a state of uncertainty in the law and what the role of the Federal courts is getting at. I think, rather, what all of these decisions say together is if you don't know one way or another, you should return, you should wind the clock back to the status quo ante before the lawsuit was filed, and at that status quo ante there was an undoubted right of the government to have $1.35 billion. Now, I understand some of you have suggested, well, maybe we should just cut it even and they get to keep the $1.35 billion and we get to keep the one and we don't have to pay the $1.2 billion. I suggest there's no principled way to do that, which is what I think Mr. Phillips' answer ultimately is. Scalia It wasn't the undoubted right of the government before the lawsuit was filed. It was the undoubted right of the lawsuit only if the contracting officer was correct that there had been a default. If he was wrong about that, it was not the right of the government. Katyal Justice Scalia, let me read to you the contract to which they agreed. It's at Joint Appendix, page 120 to 21. If the contract is terminated under the default clause, the contractor shall, on demand, repay to the government the amount of unliquidated progress payments. And then what happened as a result of that demand letter that we sent right after the termination for default was they came to us, hat in hand, and said, please don't take this money from us right now, or banks are going to complain, and so on. And so we entered into a deferment agreement, which is pages joint. Roberts I'm sorry. Do you want to give the site? Katyal Joint Appendix, page 342. And it seems to me a very odd notion of due process to say that somehow the fact that we agreed to their deferment creates some entitlement for them to keep the $1.35 billion. Kennedy I have this question about due process. The components of a due process analysis, it seems to me, are what is reasonable, what's necessary in the case, what's unconscionable. That, it seems to me, is just an extrapolation of what Reynolds says, and I don't know why we don't have that just as a law of the Federal common law of contracts. I don't know why we need to elevate this to a due process analysis. Katyal I guess I would say two things. One is if you look at the Kennedy Assuming that we apply Reynolds, which are Katyal Right. I think if you were to look to that background common law contract principle, you would look not just to Reynolds, but to Tenet, or excuse me, Totten, which I think makes clear that at the time they signed their contract, they were on notice that highly classified information that is the subject of litigation is something that generally can't be litigated in the Federal court. And then, if you wanted to think about due process and the overlay of unconscionability or whatever, with respect to Federal contracts, you would ordinarily assume that the contract itself, from highly sophisticated parties, would work that out ahead of time. And so if they were concerned about this situation unfolding, they could have written into the contract that they should get certain information, and that if the government invoked the state secrets privilege, it would automatically terminate the contract's default. It would convert a default termination into a termination for convenience. Kennedy, that just restates the question of what do you do if you apply the Reynolds principle to this case, and they would say, well, you could have put it in your contract, too, and I think that's almost a wash. Well, I don't think it comes out as a wash, Justice Kennedy, because I think the contract is undoubtedly clear that in order to challenge the decision of the contracting officer about a default termination, they have to come into Federal court and invoke affirmatively, seek affirmative judicial relief from the Federal court to change the world. We don't have to do that. Ginsburg. Am I right that this contract did specify certain information that the government agreed to give the Petitioner? That is correct. To sum it up, it's at Joint Appendix 137 to 140. Mr. Phillips said the reason they couldn't specify this information is they didn't know what it was. They didn't know what it was, secret information. They didn't know, wouldn't even know what to ask for. I have to say it is a very odd thing to bid on a highly, multibillion-dollar contract on the assumption that they're going to get some technology that they haven't even specified. I mean, this we're bidding for their research and development. They brought in Lockheed, which had built low technology, low observability planes precisely for the reason that they said they'd have the technology. At Joint Appendix page 1087, you see their bid, their offer. And I don't think anyone held a gun to their back to say, great to them. Scalia, but they claim that you knew that it was impossible to do what they contracted with you to do at the weight of plane, which they promised to come across with. They say that you knew that because of other contracts that you had had, and yet didn't tell them about it. Justice Scalia, let me say two things. First, the impossibility of a contract that you had. You don't know whether that's true or not. And we're never going to know it's true, because you came in and blew the whistle and said State Secrets privilege. Two things. One is that impossibility claim was separately litigated before the Court of Federal Claims, along with 18 other claims of theirs in defense to the $1.35 billion and the threats that we've been talking about. They've had massive opportunities to litigate almost all of their challenges, with the one exception being the superior knowledge aspect of this case. And much of that has taken place in a highly classified environment. The trial's taken place in a highly classified environment. Scalia, are you saying it was not impossible to do it at that weight? I'm saying, well, at the initial weight, we thought it was impossible and warned them as such, and that's those are the citations in the government's brief. But so it's different. At the weight contracted for. And then we at the weight contracted for, we had warned them that it wasn't, and then later we relaxed to that weight specification. So I'm not sure that is really present one way or the other. But our central submission to you, Justice Scalia, is if you're not sure, as you were saying to me, you don't know who's right and who's wrong, then the Federal court shouldn't be complicit in the process of siding and picking winners and losers in that circumstance. You are looking at everything. Roberts, are you ever the moving party in the Court of Claims? Sure, I could imagine that we could be on a counterclaim, for example. Well, on a counterclaim, but that obviously means somebody else is the moving party. They've raised the claim. That's correct. The jurisdiction is the CMT. And if somebody wants to get money, if somebody wants to get money from the Federal government, they have to go to the Court of Claims, right? That's correct. How do you say? This is a pretty convenient rule for you. Well, it's a convenient rule, Mr. Chief Justice, that they agreed to when they signed the contract. The CDA was on the books. They knew the deal going in, which is if they wanted to challenge the decision of the contracting officer, they would have to come in. Now, you could have structured it very differently. You could have said we, you know, that there would have to be a – that if there were a termination for default, it would automatically change into a termination for convenience. But you had the burden of proof on the issue of default. That was known, too, wasn't it? We had the burden of proof on default, but not on superior knowledge, the precise question here. In their rule, if you follow their rule, they're asking the Court to proceed counterfactually and say that they are entitled to the – not just the one thing in 1.35, but the 1.2 billion on top of that, as if they had proved their superior knowledge claim. And I mean, what would a – Do you think that – do you agree that there's nothing between – I think Justice Scalia was asking Mr. Phillips, well, why can't we just say let's – all bets are off, everybody go home with what they have. But Mr. Phillips says that only these two things, there's either default termination or termination for convenience, and nothing in between. Do you agree that that's the world that we're dealing with, those two choices and nothing else? I do agree that that is – that's the way the contract is written. It distinguished between those two and distinguished between liquidated payments as to which the government has no right in the event of a default termination and we're not seeking that, and unliquidated payments as to which the government has an absolute right at the moment the contracting officer decides there has been a default termination. I don't care how the contract's written. I mean, if we're going to say that there's been a broken play, that we're not going to try to apply the contract because we can't tell who's in the right and who's in the wrong, it's totally irrelevant what the contract says. You just leave the parties where they are. Justice Scalia, I am saying leave the parties where they are under the terms of the contract. And you're – well, that – Justice Scalia, I don't think that the Federal Court should be in the business of micromanaging under the due process clause in a contractual situation with parties that can protect themselves ex ante very easily. I mean, they say it's just a matter of the law of contracts. And when we look at the law of contracts and Reynolds, Reynolds talked about the moving party at the end. I'm not sure that that phrase either had or has really definable content in our law. It seems to me it's just a question of the burden of persuasion. At one point, the contractor has to proceed, he makes a – it makes a certain showing, and the government has to go back and forth. And if at some point the person with the burden of persuasion invokes the privilege, then we have to ask whether it's fundamentally fair as a matter of the Federal law of contracts. So even if you follow that reasoning, and I don't think you should for a reason I'll explain in a moment, but they would still lose because they still bear the burden of proof and persuasion on superior knowledge, the defense – the excuse that's at issue in this case. Now, I don't think that would be the rule that's an appropriate rule, Justice Kennedy, because I think underlying Reynolds is the central proposition that a court shouldn't be involved, shouldn't be picking winners and losers either way when the state of knowledge is unknowable. Kagan. So just to make sure I understand your argument, suppose that State Secrets had prevented you from being able to prove your default claim, that you were unable to make that showing because of State Secrets. What would happen then? Unable to make the showing in the Federal court? That's right. That the secrets that you were – that you wanted to protect were actually the key to your proving that there was a default. Right. Because they would be coming in and seeking affirmative judicial relief to void the contracting officer's decision and to get whatever damages they want. Let me make sure I understand, because that really does sound like a tails-you-win, heads-you-win, whatever. You're saying that if the State Secrets prevented you from making your affirmative case, you should win that one, too. I think that that would be the general proposition is if the Federal court can't know one way or another who's right and who's wrong, it shouldn't grant affirmative relief to a party. And that's just the way it is. To a moving party, and you are never the moving party. Well, again, Justice Scalia, that's the contract they signed. They could have signed a different contract with different results. They say we didn't have the ability to. Counsel, you can't ever say that. Kennedy, maybe. Did the contract contain the term moving party? The contract didn't say moving party, but it did say who had to come into Federal court in order to challenge the decision of the contracting officer. And that is a change that puts that burden on them. And now, Justice Scalia. That's what I don't understand. Yes, the default provision is decided by the contracting officer, but by law you can't collect on that judgment once they file a complaint. So you can't do anything until you get the court to affirm your default. You are asking for a legal declaration of being right, that they defaulted. That's you're the one seeking. Justice Sotomayor, this is a very important question, and I think that that's the impression left by their briefs, and it's wrong. So the filing of their claim in the Court of Federal Claims, they say vacated the contracting officer's decision. That's wrong under the statute. 605B in the Contracting Disputes Act says that a clause can be put into the contract to continue it in effect and require performance, even if there is an appeal to the Court of Federal Claims, and that provision exists in this very contract. Sotomayor, I'm sorry, you're going too fast for me, and I don't think I remember this in your reply brief. Well, I think it is. It's in a footnote of our reply brief, and it cites to 605B. And our claim is that that provision requires right now we have an absolute entitlement to the $1.35 billion. That is what the contract says. That is what even the deferment agreement says that we've entered into. So we're not asking, Justice Sotomayor, for any affirmative judicial relief at all. We don't need to do that. We want the Court, as it does in State secrets cases such as Tenet, to stay out entirely and say, to deny an audience to this case on the merits. And if you do what Mr. Phillips says, or if you do what Justice Scalia suggested, the kind of compromise option, that is affirmatively using the power of the Federal Court, granting him relief on a claim that he has not proven. And that is something I see zero precedent for. Scalia, we have no problem with a go-away rule, and if you did that and you returned to the status quo ante, we would have that $1.35 billion. That is what the contract says. That is what their own filing in September 16th, 1991, said before the Court of Federal Claims when they called that $1.35 billion, quote, money presently due and owing. Scalia, that assumes that the contracting officer's termination for default was valid. And we don't know that it was valid, and we don't want to have to inquire whether it was valid. So to say go away means everybody keeps the money he has. Justice Scalia, that seems to me that is affirmatively using the power of the Court to set aside the contracting officer's decision, which is what I think is forbidden by Reynolds. And it would be an odd rule, because it's basically a happenstance. If we had just simply insisted on our $1.35 billion at the moment that it was owed to us in February of 1991, we wouldn't even be having this conversation right now. The only reason we're having it is because we acceded to their own request to not take the $1.35 billion right away. And so we can't do that. Roberts, you keep saying these are sophisticated parties. What would the contractual term look like that would avoid this problem? Oh, I think it would be very simple. You could say in the event the government invokes the state secret's privilege, any termination for default automatically becomes a termination for convenience. That's one of many. Do you think your client would ever agree to something like that? Do I think the government would? Yeah. Well, I think if they don't, Mr. Chief Justice, that underscores the problem with their argument, because they are saying read the contract precisely this way, to eliminate terminations for default and convert them all into terminations for convenience when the state secret's privilege is being invoked. And I agree with you. I think that would be a very unusual contract for the government to get into. That is what they're demanding here, and that's what we need. So how do they write the contract? If they — your answer can't be the only way they can write it is a way that you'd never accept. So how do you contract around this problem? Well, I think that there are other ways. There's the possibility that they may demand extra money in exchange for greater risk. There may be that there may be some alternative dispute resolution mechanisms  I don't know, but I would say I would like to do that. This wouldn't be a problem in an alternative dispute resolution because that's not a court? Well, it might depend on — you might have it within the military, you know, the equivalent of that in the Tenet v. Doe, you might have panels like the Helms panel. I'm not sure what the precise contractual arrangements would be. I do think that the need for this Court to be involved is a lot lower than, say, in the criminal context of Reynolds, because the government here is a repeat player with these contractors. They're not in the business, as our deferment agreement, I think, underscores, of trying to willy-nilly advance the state secret's privilege to undermine and take their money away. Indeed, I think since the 2003 Federal Circuit decision, there have only been a couple of instances at most in which, that I'm aware of, in which the government has invoked the state secret's privilege in any sort of contracting action and nothing like the superior knowledge thing. And since 2009, the government altogether in civil court has invoked the state secret's privilege a whopping two times. So it isn't a big practical problem. All right. Let me ask, then I was misimpressioned. Would you go back to Justice Kennedy's question for a minute? I don't quite see, if you would discuss it a little bit, how you do this as a matter of constitutional law, because the Due Process Clause is tied to fundamental unfairness, and I think the answer has to be, in this kind of circumstance, secret, block or not, it depends. It depends on many things. So would you write this as a matter of constitutional law? Shouldn't it be written as a matter of Federal common law of contracts? Shouldn't it be written as an exposition of the superior knowledge doctrine, which seems totally open to it? And or shouldn't it be written as a matter of discovery law, which is what the district judge, who ended up thinking, the court of claims judge, says, gee, I don't really know. I mean, that's how I read it. How would you speak about this for a minute? Sure. Justice Breyer, I think that due process is an ill-fitting concept in this contractual dispute for a couple of reasons. Not just can the sophisticated parties agree ahead of time to other things, but also the whole notion of due process and contracts is odd, because the government has waived its sovereign immunity only since 1855. They don't have any freestanding right to come in ab initio and claim fundamental fairness on contracts. I think that is implicit in the Constitution itself, that they don't have that right. And so the question becomes, is there some extra protection the courts should give here akin to the one in Reynolds about criminal defendants and the government using State Secrets information? And I think the answer to that is no, because parties can work that out themselves ex ante. And so my answer to you is, I think it was option B, to use the contract as the base and contractual interpretation as the basic rule for decision here. The contract itself specified, and it was done under the shadow of Reynolds and under the shadow of Totten, that it specified that they would have to be the moving party. They would have to come in and challenge the decision of the contracting officer. Kennedy, well, in the whole law of contracts, you could say, oh, the contracting parties could have put this down, anticipatory breach. We don't need to have rules on that, but the parties could have negotiated it. That's not the way the contract law works. Well, I do think that with respect to this, and this, you know, thousands and thousands of page contract, I think that this specific set of issues could have been worked out in advance and I do think was worked out in advance. They knew going in that they bore the burden of walking into court, paying their attorneys and everything else to challenge the decision of the contracting officer, and they also knew at that moment the government had an undoubted right to the unliquidated progress payments. The contract they signed distinguished between liquidated progress payments, as to which the government has no right, and unliquidated payments, as to which default termination automatically gave that to the government. And the argument they are advancing here is, well, let's collapse those two, let's keep the $1.35 billion, because the government hasn't given it to us yet. Scalia. Why is that unliquidated? I didn't get the distinction between the two. Why is the $1.35 billion unliquidated? Because the contract specified two payment streams. One is the work that they had reviewed and understood and the government had said this is good work, we are going to pay you for it, and other work, which are claims that they have made, but they haven't actually been approved by the government. And I think, Mr. Phillips, I don't think that there is any sort of evidence or certainly nothing that the courts below found that says that they had a right to the unliquidated progress payments. Scalia. What's the other $1.25 billion? The $1.2 billion that he's seeking on top of keeping the $1.35 billion is, as I understand it, his costs, his extra costs incurred under the contract above and beyond the $4.8 billion that was in the initial contract. Sotomayor, do you have the citation to that footnote you referred to in the 605B? I can find it later, but do you have it? It's page 32, and I'd also refer the Court to the Court Appeals Appendix page 19567, which is the page of the contract itself that incorporates the provision. The provision is FAR 52.233-1H, and it says that it mandates performance and compliance with the contract even when they're in the contracting officer's decision, even when a decision is under appeal. So it is not the case whatsoever that their filing of this claim somehow vacated the contracting officer's decision. The only way that will happen is if this Federal court reverses the Federal circuit and grants them the positive. Sotomayor, so your view is that the complaint did not stay their obligation to pay you, that provision required them to pay you? That's correct. Sotomayor, so the Court is asking the Court to simply defer the unliquidated sums. That's right. At that moment, they had to pay. They knew that, and they in fact sent a bank letter and so on, this is Joint Appendix 329, saying please don't do that. And then we entered into a deferment agreement. But we have an absolute right to that money right now, regardless of what we don't need an affirmative decision from this Court in order to get that money. We're asking the Court to simply stay its hand and follow the Hippocratic principle of doing no harm in a world in which they want the Court can't decide who's right and who's wrong. If you're right about that, you're the government's absolute right, could you withhold it from other contracts of these contractors? That's absolutely right. The Federal rules and the Contract Disputes Act provide us an offset so that we could we don't have to actually seek the $1.35 billion from their coffers, as he colorfully called it, reaching into. We can just offset it against future contracts and the Federal courts would be out of the business altogether about that $1.35 billion. Roberts. So you get the extra money without having to go to court, because then they'd have to go to court and challenge your offset. And again, Mr. Chief Justice, that's the contract to which they signed. Thank you. Thank you, General. Mr. Phillips, you have 3 minutes remaining. Thank you, Mr. Chief Justice. Justice Kennedy, I think the answer to your question is that this case can properly be decided on Federal common law principles, and indeed, I would ask the Court to apply the same, those contract principles in this context to, which is on the joint appendix on page 209. General Katyal focuses on what happens when the contracting officer takes some action. What he leaves out is the following sentence. The contractor shall have the right of appeal under the disputes clause from any determination by the contracting officer. And while the General spends an awful lot of time talking about what do you do in the Article III context, the Contracting Disputes Act specifically allows us to go to a board of contract appeals, which is not an Article III institution. And I guarantee you that the government would be making exactly the same argument if we had taken that particular route. It seems to me the case ought not to be decided on the basis of this kind of a technical assessment. The case ought to be decided on the basis of sort of where the rights are and what's the fundamental change and who's making the shift in one direction or the other. And if you do that, and, Justice Ginsburg, you specifically asked the question, am I asking for all or nothing? No. I think there's no question that you can come up with a principle basis to adopt precisely the principle that Justice Scalia pointed out, which is to say we'll stay our hand, we will not uphold the contracting officer's decision, and therefore we're not going to say there's a default, but we're not going to go the extra mile and say it's a termination for convenience. The Court can certainly do that. Ginsburg. So you are saying there is another way, there's a middle way. There is a middle way. There's no question about it. All I was saying in response to Justice Scalia's question was, you know, wait. On what principle of law? On the principle of law that if you don't have a contract for default, then there's no basis for that, and we're not going to do any more than that. We can't decide who's right and who's wrong, and therefore we're not going to enforce the contracting officer's decision and we're not going to do anything more than this. We're going to leave the status quo ante, which means before the contracting officer declared that there was a default under these circumstances. It's the go-away principle of our jurisprudence, right? I actually get that a lot. Justice Scalia. Mr. Phillips, I understood your papers as making only a constitutional claim. No. I don't read that, Justice Kagan. I mean, we certainly have a due process argument in there, but embedded in there as well are a number of references to Federal common law principles as a, obviously, nonconstitutional basis on which to rule in our favor. I mean, I think the Court ought to be informed in making its determination about how to interpret the contracting arrangement by the question of whether this is fundamentally unfair and unconscionable, obviously, but you would probably do that as a matter of Federal common law principles and trying to decide on contracting principles or not. At the end of the day, Your Honors, this has been fundamentally unfair, and we'd ask for the Court to reverse. Thank you, Mr. Phillips. General, the case is submitted.